# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TODD CHARLES PENN,

      Plaintiff,

v.

JASON BERGTOLD,

      Defendant.

Case No. 17-cv-10862
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT JASON BERGTOLD'S MOTION FOR SUMMARY JUDGMENT (ECF #36)

Defendant Jason Bergtold, a City of Novi police officer, arrested Plaintiff Todd Charles Penn for allegedly attempting to steal merchandise from a Bed Bath & Beyond store. Penn was later charged with retail fraud, and a jury acquitted him of that charge. Penn then filed this action in which he alleges that Bergtold arrested him without probable cause and maliciously prosecuted him – both in violation of the Fourth Amendment. (*See* Compl., ECF #1.) Bergtold has now moved for summary judgment based, in part, on qualified immunity. (*See* Mot., ECF #36.) For the reasons explained below, the Court **GRANTS** summary judgment in favor of Bergtold on Penn's unlawful arrest claim and **DENIES** summary judgment to Bergtold on Penn's malicious prosecution claim.

# I

## A

On March 21, 2015, an African American man was shopping at a Bed Bath & Beyond store located in a strip mall in Novi, Michigan. (*See* Jacob Leonard Deposition, ECF #36-10 at Pg. ID 1143.) When the man was leaving the store, he had at least one "very large bag" in his possession. (Kathleen Simons Dep., ECF #40-9 at Pg. ID 1610.) As he left, he walked past Bed Bath & Beyond cashier Jacob Leonard. (*See* Leonard Dep., ECF #36-10 at Pg. ID 1149-50.) The man drew Leonard's attention because he "activate[d] the [store's] security system," which indicated that he may not have paid for all of his items. (*Id.* at Pg. ID 1149.) The alarm "didn't faze [the man]. He just proceeded to walk out [of the store]." (*Id.*)

Leonard and a second Bed Bath & Beyond employee, Kathleen Simons, then followed the man into the store's parking lot. (*See id.* at Pg. ID 1149-51.) They confronted him, and he did not say that he paid for all of his items. Instead, he responded that the employees "[did not] have the right to [question him]" because he was "a police officer." (*Id.* at Pg. ID 1150). A third Bed Bath & Beyond employee, Kelly Gauthier, then joined Leonard and Simons in the parking lot and confronted the thief. (*See id.*) The man subsequently abandoned his bags and started walking towards the opposite end of the strip mall. (*See* Kelly Gauthier Dep., ECF #40-10 at Pg. ID 1684, 1699.)

At around the same time that Gauthier confronted the thief outside of the store, Leonard called 911. (*See* Leonard Dep., ECF #36-10 at Pg. ID 1155-56.) Novi police officers, including Bergtold, were dispatched to the scene at 5:03 p.m. (*see* Police Report, ECF #36-3 at Pg. ID 748), and they arrived on the scene "within five minutes" of Leonard's call. (Leonard Dep., ECF #36-10 at Pg. ID 1156.)

Bergtold then spoke with Simons and Gauthier. The two women provided Bergtold similar descriptions of the thief that they had seen and confronted. Simons described the thief as "[a]n older black male, black Pea coat, gray hat, and [] she thought … blue jeans." (Bergtold Dep., ECF #36-2 at Pg. ID 611.[1]) Simons also told Bergtold that the "male identified himself as a police officer." (*Id.*) Gauthier informed Bergtold that the thief was a "black male, 50 to 60 [years old]" wearing a "grayish … knit cap," a "black jacket," and "blue jeans." (Gauthier Dep., ECF #40-10 at Pg. ID 1685.) Gauthier further told Bergtold that the thief's coat was "like a Pea coat." (*Id.*) She explained to Bergtold that "it was a flat jacket that wasn't a puffy jacket like a ski jacket. It was Pea coat length but [she] wasn't sure of the type of jacket." (*Id.*) Gauthier also described the thief as "unusual" (*id.* at Pg. ID 1684) and "unstable." (Bergtold Dep., ECF #36-2 at Pg. ID 632.) Finally, Gauthier told

---

[1] At Simons' deposition, she could not recall how she described the thief to Bergtold. (Simons Dep., ECF #40-9 at Pg. ID 1616.)

Bergtold that the thief was last seen walking towards the opposite end of the strip mall. (*See* Gauthier Dep., ECF #40-10 at Pg. ID 1699.)

## B

Not long after Bergtold spoke to the Bed Bath & Beyond employees, he began searching the area of the shopping center near where the thief was last seen. (*See* Bergtold Dep., ECF #36-2 at Pg. ID 654-55.) One of the stores in that location was Value City. (*See id.*) Bergtold saw a man "in the parking lot in front of Value City" who, Bergtold believed, appeared similar to the physical description of the thief. (*Id.* at Pg. ID 656.) At approximately 5:26 p.m., Bergtold approached the man and began speaking with him. (*See* Dashcam Recording, ECF #36-7.) The man was Penn.

## C

Bergtold's initial interaction with Penn was captured on Bergtold's dash cam recording system. (*See id.*) As depicted in that video, Bergtold approached Penn and asked if he could speak with him, and Penn answered "Yeah." Bergtold then asked Penn if he had been to the Bed Bath & Beyond, and Penn responded "No." Bergtold next asked Penn who he worked for. Penn said that he worked for the "Wayne County Sheriff." Later, Bergtold asked Penn if he was armed, and Penn responded that he was because he "work[ed] for you guys." Penn immediately thereafter told Bergtold that he was "one of you all" (*i.e.*, law enforcement). Bergtold then

explained to Penn that he (Bergtold) had been given a description of a "guy [who] looks just like you."

In fact, the description of the thief that Bergtold had received was not an exact match to Penn. Penn did match the description in certain respects: he was an older, African-American male (*see* Penn Dep., ECF #40-6 at Pg. ID 1426-27); he was located in the same vicinity where Bergtold was told the thief was last seen (*see id.* at Pg. ID 1427); he was wearing a cap, black jacket, and long pants (*see id.* at Pg. ID 1428); and he was employed as a law enforcement officer (*see id.* at Pg. ID 1412). However, Penn also differed from the described thief in some respects: Penn was wearing a brown hat, not a "grayish" hat (*see id.* at Pg. ID 1428); he was wearing brownish-green cargo pants, not blue jeans (*see id.*); he was wearing a "black North Face puffy coat," not the "flat…pea coat" that Gauthier described to Bergtold (*see id.*); and while Gauthier described the thief as "unstable," Bergtold considered Penn "[not] aggressive[] and relatively calm" during their interaction. (Bergtold Dep., ECF #36- 2 at Pg. ID 696.)

During the conversation between Bergtold and Penn, Penn suggested that two of them go to the Bed Bath & Beyond store. (*See* Dashcam Recording, ECF #36-7; Penn Dep., ECF #40-6 at Pg. ID 1433.) Penn apparently believed that the witnesses would quickly confirm to Bergtold that Penn was not the thief they had confronted. Bergtold at first ignored that request. (*See id.*) But after Penn again suggested

returning to Bed Bath & Beyond so that the witnesses could exonerate him, Bergtold agreed to take Penn to the store. (*See id.*)

## D

Bergtold then returned to Bed Bath & Beyond with Penn. Bergtold went inside the store to speak with Leonard, Gauthier, and Simons.[2] (*See* Bergtold Dep., ECF #36-2 at Pg. ID 705.) Penn took a seat on the hood of a police car. (*See* Dashcam Recording, ECF #36-7; Penn Dep., ECF #40-6 at Pg. ID 1433-34.) Penn was not handcuffed or restrained in any way while sitting on the hood. (*See* Penn Dep., ECF #40-6 at Pg. ID 1433.) While seated, he spoke with other officers on the scene. (*See id.*)

Bergtold had Leonard, Gauthier, and Simons look at Penn through the store window, and he asked each of them if Penn was the man that they saw attempt to steal items from the store. (*See* Bergtold Dep., ECF #36-2 at Pg. ID 705.) Leonard positively identified Penn as the man that he saw set off the security alarm and attempt to steal items from the store. (*See* Leonard Dep., ECF #36-10 at Pg. ID 1177.) Gauthier also positively identified Penn as the thief. (*See* Gauthier Dep., ECF #40-10 at Pg. ID 1687.) Gauthier identified Penn as the thief even though, as

---

[2] Bergtold testified that when he first returned to Bed Bath & Beyond, Penn accompanied him inside the store. (*See* Bergtold Dep., ECF #36-2 at Pg. ID 705.) Penn denies that he was taken into the store at that time. (*See* Penn Dep., ECF #40-6 at Pg. ID 1433-34.)

described above, Penn's clothing differed from the clothing that she told Bergtold the thief was wearing and despite the fact that Penn did not appear to Gauthier to be mentally unstable. (*See id.* at Pg. ID 1687-88.) Gauthier based her identification on her "face-to-face encounter" with the thief. (*Id.* at Pg. ID 1687.) Gauthier insists that she was then, and remains today, "certain" that Penn was the thief she confronted in the store parking lot. (*Id.* at Pg. ID 1698.)

Simons, however, told Bergtold that she "[didn't] believe that [Penn was] the [thief]" because Penn was "taller and larger" than the man she confronted. (Simons Dep., ECF #40-9 at Pg. ID 1627.) Simons says that she "remember[s] telling [Bergtold], you know, I'm not sure but I don't think that's the guy. I don't think that's the guy. The guy I saw, and this is what I told [Bergtold], … the guy I saw larger, taller, different." (*Id.* at Pg. ID 1639.)

At around this same time, another person who had been shopping at the strip mall approached the other officers on the scene. That man, Ferris Anthony, "told [the officers] you guys arrested the wrong guy. [Penn] was very clearly different than the man that I saw walking out of [the store]." (Anthony Dep., ECF #40-8 at Pg. ID 1562.) Anthony said the same thing to Bergtold when Bergtold returned from inside the store. (*See id.*)

**E**

Bergtold ultimately arrested Penn for retail fraud. Bergtold concluded that he had probable cause for the arrest based on "all [of] the information [he] had" at the time of Penn's arrest. (Bergtold Dep., ECF #36-2 at Pg. ID 704.) That information included, but was not limited to, the positive eye-witness identifications of Penn by Leonard and Gauthier, the fact that Penn was located around the same time and near the same location of the strip mall where the thief was last seen, that Penn matched some portion of the description given to Bergtold (*i.e.*, age, race, sex, the color of his coat, the length of his pants, and the wearing of a dark-colored hat), and the fact that Penn was employed as a law enforcement officer (which matched the thief's statement that he was a law enforcement officer). (*See id.* at Pg. ID 704-05.) Bergtold said that he found it "very important" that the thief had identified himself as a law enforcement officer and that Penn was also employed as a law enforcement officer. (*Id.* at Pg. ID 736.)

**F**

Bergtold later returned to the station and drafted a police report. (*See* Police Rpt., ECF #36-3.) In that report, Bergtold wrote that Gauthier, Leonard, Simons, and Anthony had all "positively identified" Penn as the thief. (*See id.* at Pg. ID 750, 752.) In fact, however, neither Simons nor Anthony positively identified Penn as

the thief.[3] (*See* Simons Dep., ECF #40-9 at Pg. ID 1628; Anthony Dep., ECF #40-8 at Pg. ID 1565.)

Bergtold also described his first contact with Penn. Bergtold wrote that when he first addressed Penn, Penn "got out of [his] car, [] began walking toward me,"

---

[3] During Penn's earlier criminal trial, Anthony testified that he had, in effect, "sign[ed] on" to the identification of Penn by other witnesses. (Anthony Crim. Trial Tr., ECF #36-12 at Pg. ID 1266.) But that testimony is inconsistent with Anthony's deposition testimony in this case that he did *not* identify Penn as the thief. (*See*, *e.g.*, Anthony Dep., ECF #40-8 at Pg. ID 1565.) For the purposes of this motion, the Court must credit Anthony's deposition testimony because it is more favorable to Penn. Bergtold counters that during Anthony's deposition, Anthony actually confirmed the accuracy of his trial testimony that he had "sign[ed] on" to the identification of Penn, and Bergtold says that this portion of Anthony's deposition testimony establishes that he did identify Penn as the thief to Bergtold. (*See* Mot., ECF #36 at Pg. ID 539, citing Anthony Dep., ECF #40-8 at Pg. ID 1586-89.) The Court has carefully reviewed Anthony's deposition testimony, and it is not persuaded that Anthony admitted that he "sign[ed] on" to the identification of Penn by others or that he otherwise identified Penn as the thief. Anthony was never directly asked during his deposition: did you "sign on" to the identification of Penn by any other witnesses? Instead, he was asked ambiguously-worded questions about his trial testimony to that effect. (*See* Anthony Dep., ECF #40-8 at Pg. ID 1586-89.) These questions were ambiguous because, among other things, it is not clear whether they asked Anthony to confirm the *fact* that he testified at Penn's trial that he signed on to someone else's identification of Penn or whether they asked him to confirm that that trial testimony was, in fact, accurate. Thus, Anthony's answers to these questions, when construed in the light most favorable to Penn, are not an admission or acknowledgment by Anthony that he signed on to anyone else's identification at the scene. Moreover, while Anthony arguably testified during his deposition that he internally second-guessed his initial conclusion that Penn was not the thief (*see id.* at Pg. ID 1578, 1585), he did not clearly testify during his deposition that he shared his second-guessing with Bergtold or the other officers. For all of these reasons, and for purposes of this motion, the Court credits Anthony's deposition testimony that he told police that Penn was not the thief and concludes that Anthony did not "sign on" to the identification of Penn by any other witnesses.

said "'I am one of you[,]' and showed me a badge." (Police Rpt., ECF #36-3 at Pg. ID 749.)  Bergtold later noted in the report that "one of the first things he [Penn] told me [was] that … [I am] 'one of you.'" (*Id.* at Pg. ID 750.)

On March 24, 2015, Detective Randall Mince of the Novi Police Department reviewed "the [police] report and obtained a copy of the surveillance footage from Bed Bath & Beyond." (*Id.* at Pg. ID 756.)  Based on that review, and in reliance on the information in the report, Detective Mince decided to "forward[]" the case "for a warrant." (*Id.; see also* Mince Dep., ECF #40-12 at Pg. ID 1717.)  The Oakland County Prosecutor ultimately charged Penn with retail fraud.

The case against Penn then proceeded to trial.  At the conclusion of the prosecution's case, Penn moved for a directed verdict.  The state trial court denied Penn's motion.  The trial court noted that it was the "toughest directed verdict [motion]" that the court had encountered and that "if this was a bench trial, [the court would] acquit [Penn]." (ECF #25-8 at Pg. ID 415.)  But, the trial court concluded that when viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence from which a jury could find Penn guilty of retail theft beyond a reasonable doubt. (*See id.*)  The trial court relied heavily on the fact that the thief had "said [that he was] a police officer immediately and then it just so happen[ed] that coincidentally the person that the officers [came] upon [was] a police officer as well." (*Id.*) The trial court found that to be "a[n] unusual fact to

happen by coincidence in such a short period of time." (*Id.*)  At the close of the proofs, the jury acquitted Penn of the retail fraud charge.

## II

Penn filed this action against Bergtold on March 19, 2017.[4] (*See* Compl., ECF #1.) Penn brings two claims against Bergtold under the Fourth and Fourteenth Amendments, both pursuant to 42 U.S.C. § 1983.  First, Penn alleges that Bergtold "wrongfully" arrested him. (*See id.* at ¶32, Pg. ID 7.)  Second, Penn claims that Bergtold "falsely reported and participated in [Penn's] unlawful prosecution." (*Id.*)

Bergtold moved for summary judgment on Penn's claims on June 28, 2018. (*See* Mot., ECF #36.)  In that motion, Bergtold argued that he is entitled to qualified immunity. (*See id.*)

The Court held a hearing on Bergtold's motion on February 5, 2019. (*See* ECF #43.)  On March 8, 2018, the Court ordered the parties to submit supplemental briefs on issues related to Bergtold's qualified immunity defense. (*See* Order, ECF #44.) Among other things, the Court directed Penn to identify "(1) the most factually-analogous cases in which courts have determined that an officer did not have probable cause to arrest and/or that an officer could not reasonably have concluded that probable cause to arrest existed and (2) the most factually-analogous cases in

---

[4] Penn also brought claims against Bed Bath & Beyond. (*See* Compl., ECF #1.)  Penn stipulated to dismiss those claims on May 25, 2018. (*See* ECF #34.)  Thus, Bergtold is the only remaining Defendant in this action.

courts have determined that there was not probable cause for the criminal charge." (*Id.* at Pg. ID 1763-64.) The Court also asked the parties to identify cases in which courts discussed "(1) whether an identification that results from [an allegedly-unreliable identification procedure] may be used when determining whether there is probable cause to arrest and (2) whether an identification that results from such a procedure may be used when determining whether there is probable cause to charge a suspect with a crime." (*Id.* at Pg. ID 1764.) The parties filed these supplemental briefs on March 21 and 22, 2019. (*See* ECF ## 45, 46.)

### III

The summary judgment standard and its application in the qualified immunity context are well-established. A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require

submission to a jury." *Id.* at 251-252. "Credibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Once raised, it is the plaintiff's burden to show that the defendant[] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The United States Court of Appeals for the Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [the court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Id.* (internal punctuation omitted). "[U]nder either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## IV

The Court begins with Penn's claim that Bergtold arrested him without probable cause in violation of the Fourth Amendment. Bergtold argues that he is entitled to summary judgment on this claim based upon qualified immunity. The Court agrees.

## A

Penn contends that Bergtold's probable cause determination was invalid because it was based in large part upon the identifications of Penn by Gauthier and Leonard. As described above, those two Bed Bath & Beyond employees positively identified Penn as the thief while Penn sat on the hood of a police vehicle that was parked in front of Bed Bath & Beyond. Penn insists that these identifications do not support a finding of probable cause because they were the product of a suggestive "show up." (*See* Penn Resp. Br., ECF #40 at Pg. ID 1368-70.) A "show up" occurs "when only one suspect is presented to [a] witness." *United States v. Funches*, 84 F.3d 249, 254 (7th Cir. 1996). The practice of conducting a show up "has been widely condemned" because it may induce a witness to conclude incorrectly that the police have apprehended the real perpetrator. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Penn argues that because the show up identification procedure is inherently flawed, Bergtold should have excluded the Gauthier and Leonard identifications

from his probable-cause analysis. This argument fails to overcome Bergtold's qualified immunity defense for two reasons.

**1**

Penn has failed to show that clearly-established federal law prohibited Bergtold from relying on the Gauthier and Leonard identifications in his probable-cause analysis. Penn has not cited any case in which any court has held that an officer may not rely upon an identification from an allegedly-suggestive show up when determining whether he has probable cause to arrest. Instead, Penn relies heavily on the Sixth Circuit's decision in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006). Penn highlights the Sixth Circuit's statement that "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Id*. at 746-47 (quoting *Stovall*, 388 U.S. at 302). But the "use" to which the Sixth Circuit referred appears to be the *admission of the identification at trial*, not the officer's reliance on the identification in determining that he had probable cause to arrest. Indeed, later in the court's Opinion, the court recognized "that an unduly suggestive identification does not, in and of itself violate constitutional rights" and "that *the prosecution's use of the identification at trial* is a necessary intervening act for injury to occur and liability

15

for any party to attach." *Id*. at 747 (emphasis added) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977)).

More importantly, the court in *Gregory* cited with approval its earlier decision in *Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993). *See Gregory,* 444 F.3d at 746. The court's reliance on *Hutsell* further suggests that it did not hold that an officer may not rely upon an identification made during an unduly suggestive show up when determining whether he has probable cause to arrest. In *Hutsell*, the court explained that "[t]he procedural safeguards established in *Brathwaite* and *Stovall* protect *only against the admission of unreliable evidence at trial and does [sic] not establish a constitutional right to be free of suggestive lineups*." *Id*. at 1005 (emphasis added) (quoting *Hensley v. Carey*, 818 F.2d 646, 648-49 (7th Cir. 1987)). And, critically, the court in *Hutsell* held that a plaintiff "fail[s] to state a claim for an alleged violation of a known constitutional right" where he alleges that, as the result of an "impermissibly-suggestive" identification procedure, he was "unreasonably seized without probable cause." *Id.* at 1003, 1005. Penn has failed to reconcile *Gregory's* reliance on *Hutsell* with his argument that *Gregory* forbids officers from relying upon show-up-based identifications when making probable cause determinations.

For all of these reasons, Penn has failed to show that *Gregory*, or any other authority, clearly establishes that an officer may not consider an identification based upon a show up when determining whether he has probable cause to arrest.

As noted above, the Sixth Circuit in *Gregory* analyzed and applied rules established by the Supreme Court for assessing whether an identification made during a suggestive identification procedure should be admitted into evidence at trial. *See Gregory*, 444 F.3d at 746-47 (citing *Manson*, 432 U.S. at 113 and *Stovall*, 388 U.S. at 302).  Even if, as Penn argues, these rules do apply to probable cause determinations, Bergtold would still be entitled to qualified immunity.  That is because, as described below, Penn has failed to show that the Gauthier and Leonard identifications were so unreliable that they clearly would have been excluded from evidence at trial.  And since it was not clear that the identifications would have been excluded from evidence at trial, it would not have been clear to a reasonable officer in Bergtold's position that he could not rely upon the identifications when determining whether he had probable cause to arrest.

A district court applies a "two-step analysis" in determining whether an identification is admissible at trial. *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir 2001).  "First, [the court] consider[s] whether the identification procedure was suggestive." *Id.*  Second, if the court "find[s] [that] the procedure was suggestive, [the court] then determine[s] whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible." *Id.* (internal citations omitted).  "The five factors to be weighed in determining reliability are: 1)

the opportunity of the witness to view the perpetrator during the crime; 2) the witness's degree of attention to the perpetrator; 3) the accuracy of the witness's prior descriptions of the perpetrator; 4) the level of certainty demonstrated by the witness when identifying the suspect; and 5) the length of time between the crime and the identification." *Id.* "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.*

Penn has not cited a single case in which any court has applied this two-part test and excluded from evidence identifications like those made by Gauthier and Leonard. Nor has Penn shown that the identifications – even if made as the result of a suggestive show up – were so unreliable that they clearly would have been excluded under the test. With respect to both identifications, at least some of the five factors weigh strongly in favor of admission. Leonard had an opportunity to view the thief during the crime with a reasonable degree of attention, he was certain that Penn was the thief, and there was a relatively short amount of time between when Leonard confronted the thief and when he identified Penn as that thief.[5]

---

[5] Leonard testified about the events in question at his deposition in this case and at Penn's criminal trial in state court. As Penn correctly notes, there are some inconsistencies between Leonard's trial testimony and his deposition testimony. (Compare Leonard Crim. Trial Tr., ECF #36-5 with Leonard Dep., ECF #36-10.) Penn argues that because Leonard gave inconsistent accounts, Bergtold could not reasonably have relied upon Leonard's identification. (*See* Penn Supp. Br., ECF #46 at Pg. ID 1834-35.) But Leonard gave his inconsistent testimony long after Bergtold arrested Penn, and Penn has not shown that Bergtold was aware of any inconsistent statements by Leonard at the time of the arrest – *i.e.*, at the time Bergtold relied on

Likewise, Gauthier had a clear opportunity to view the thief with a reasonable degree of attention during the crime, she was unequivocal that Penn was the thief, and there was a relatively short amount of time between when Gauthier confronted the thief and when she identified Penn as that thief. It is true, as Penn highlights, that there were some discrepancies between Gauthier's original description of the thief and Penn's actual appearance (such as the length and material of Penn's jacket, the color and material of his pants, and his demeanor). (*See* Penn Supp. Br., ECF #46 at Pg. ID 1836.) But the "the accuracy of the witness's prior descriptions of the perpetrator" is only one of the five factors that a court applies when determining whether an identification is reliable. *Crozier*, 259 F.3d at 510. And the other four factors tend to support the conclusion that Gauthier's description was reliable. Thus, while Gauthier did provide a description of the thief that did not match Penn in several respects, that factor alone did not clearly render her identification unreliable.

For all of these reasons, the Gauthier and Leonard identifications were not so unreliable that they clearly would have been excluded from evidence under the applicable five-part test. Therefore, it would not have been clear to a reasonable officer in Bergtold's position that – if the test for admission of identifications at trial applied in the probable cause context – he could not rely on the Gauthier and Leonard

Leonard's identification of Penn. That Leonard appeared to give inconsistent statements long after the arrest does not undermine the reasonableness of Bergtold's reliance on Leonard's identification at the time of the arrest.

identifications in assessing whether he had probable cause to arrest Penn. And for that reason, Bergtold's reliance on those identifications did not strip him of his qualified immunity. *See*, *e.g.*, *Green*, 681 F.3d at 864 (in order to overcome a qualified immunity defense, plaintiff must demonstrate that defendant-officer violated clearly established constitutional right).

## B

Penn further argues that Bergtold is not entitled to qualified immunity because, under the totality of the circumstances, Bergtold plainly lacked probable cause to arrest him. In support of that argument, Penn stresses that in many respects he did not match at least one of the descriptions of the thief originally given to Bergtold and that two eyewitnesses told Bergtold that he was *not* the thief.

Penn's attack on Bergtold's probable cause determination is a serious one. He has made a persuasive case that Bergtold may, perhaps, have lacked probable cause for the arrest. But a "lack of probable cause is not necessarily fatal to an officer's defense against civil liability for false arrest. Rather, an officer is entitled to qualified immunity under § 1983 if he or she could reasonably (even if erroneously) have believed the arrest was lawful in light of clearly established law and the information possessed at the time. *Id.* at 865.[6] Bergtold is entitled to qualified

---

[6] *See also Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) ("Thus, even if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts

immunity here because Penn has failed to show that Bergtold's probable cause determination, even if wrong, was unreasonable.

"Probable cause to make an arrest exists if, at the moment of the arrest, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal punctuation omitted). "[W]hether probable cause for a crime exists is based on an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*." *Green*, 681 F.3d at 865 (emphasis in original; internal quotation marks omitted). Indeed, "[p]robable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein*, 275 F.3d at 550 (internal quotation marks omitted). And the "probable cause requirement 'does not demand any showing that such a belief is correct or more likely true than false.'" *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). *See also United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2009) (same).

---

favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful").

The following undisputed facts known to Bergtold, taken together, are sufficient to support a reasonable belief that there was probable cause to arrest Penn:

- Bergtold located Penn shortly after the alleged theft in the same general location where the thief was last seen;

- Penn was the same approximate age, same gender, and same race of the thief that witnesses described to Bergtold;

- Penn was wearing similar, though not identical, clothing to the thief that witnesses described to Bergtold;

- The thief identified himself as a law enforcement officer, and Penn was employed as a law enforcement officer;

- Bed Bath & Beyond employee Jacob Leonard, who saw the thief exit the store and who confronted the thief in the store parking lot, positively identified Penn as the thief. The record does not reflect that Leonard's identification of Penn conflicted with any information that Leonard had previously provided to Bergtold; and

- A second Bed Bath & Beyond employee, Kelly Gauthier, who also confronted the thief in the parking lot, positively identified Penn as the thief. Gauthier was "certain" of her identification even though Penn did not exactly match the description of the thief she that had earlier given to Bergtold.

Penn counters that Bergtold acted unreasonably because he violated two clearly-established rules when he determined that he had probable cause to arrest. Penn first invokes the rule that "[a]n eyewitness identification will constitute

sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted). Penn says that Bergtold ran afoul of this rule when Bergtold relied upon the Leonard and Gauthier identifications even though he had at least some reason to believe that they were both mistaken.

But the record reveals that Bergtold did not blindly accept the Leonard and Gauthier identifications, nor did he arrest Penn based solely on those identifications. Indeed, Bergtold testified that he based his decision to arrest Penn on "all [of] the information [he] had" and "not just the [identifications from the] show-up." (Bergtold Dep., ECF #36-2 at Pg. ID 704.) And as Bergtold was considering the "whole thing," he found it "very important" that, when asked where he was employed, Penn identified himself as a law enforcement officer. (*Id.* at Pg. ID 736.) Bergtold reasonably regarded that fact as significant because it is undisputed that the thief proclaimed that he was a police officer. Indeed, at Penn's state court criminal trial, the judge observed that the overlap between Penn's law enforcement employment and the thief's self-identification as a police officer was "an unusual fact to happen by coincidence in such a short period of time." (ECF #25-8 at Pg. ID 415.) And the judge highlighted that fact in denying Penn's motion for directed

verdict. (*See id.*)  Bergtold did not act unreasonably when he concluded that the Gauthier and Leonard identifications *plus* Penn's employment as a police officer established at least probable cause to arrest Penn.

Penn next invokes the rule that an officer must consider "both the inculpatory and exculpatory evidence before determining if he has probable cause to make an arrest." (Penn Resp. Br., ECF #40 at Pg. ID 1370, quoting *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009).)  Penn argues that Bergtold wrongly "exclude[d]" from his probable cause determination "readily available exculpatory evidence." (*Id.*)  For instance, Penn says that Bergtold should have gone into the Value City store in order to "investigate Penn's exculpatory alibi" that he was returning items at that store at the time of the alleged robbery at Bed Bath & Beyond. (*Id.*)

But as Bergtold explained at his deposition, he did not go into the Value City store because *Penn suggested* that he (Bergtold) attempt to verify Penn's innocence in a *different* way:

> I did not go into Value City and talk to any employees because [Penn] requested to go to Bed Bath & Beyond.  It was an immediate [request that] he wanted to go there, and I entertained him.  As far as if you're going to ask me if I tried to establish an alibi, I guess by catering to the request to go to Bed Bath & Beyond I was giving him the opportunity to clear that up.

(Bergtold Dep., ECF #36-2 at Pg. ID 683.)  Penn has not shown that Bergtold

violated Penn's clearly-established right to have known exculpatory evidence considered before being arrested.

C

In the end, the question of whether Bergtold actually had probable cause to arrest Penn is an exceedingly difficult one. The facts known to Bergtold weighing in favor of probable cause are nearly in equipoise with those weighing against probable cause – so much so that the fact pattern here would be well-suited for a law school criminal procedure examination. The difficulty of the probable cause question requires the Court to uphold Bergtold's qualified immunity on Penn's unlawful arrest claim. Indeed, "it is precisely for the hard case that [qualified] immunity exists." *White by White v. Chambliss*, 112 F.3d 731, 739 (4th Cir. 1997). Bergtold is entitled to that immunity from Penn's unlawful arrest claim because under all of the circumstances, he could reasonably – even if erroneously – have believed that he had probable cause to arrest Penn.[7]

---

[7] Penn suggests that federal courts have found a lack of probable cause to arrest in a number of cases involving similar facts and that these cases show that Bergtold could not reasonably have believed that he had probable cause to arrest here. (*See* Penn Supp. Br., ECF #46 at Pg. ID 1828-31.) However, the cases cited by Penn are distinguishable. Penn first relies upon the Sixth Circuit's decision in *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999). But the court in *Ahlers* determined that there *was* probable cause to arrest in that case. *See id.* at 372. Next, Penn cites *Keuhl v. Burtis*, 173 F.3d 646 (8th Cir. 1999). In *Keuhl*, the Eighth Circuit determined that the defendant officer was not entitled to qualified immunity on a false arrest claim. The court stressed that the officer both "ignored" a witness' attempt to "retract her statement" and "refused to interview" another witness who would have exonerated

## V

Penn next claims that Bergtold maliciously prosecuted him in violation of the Fourth Amendment. This claim is based on Penn's allegation that Bergtold made materially false statements in his police report and that those false statements led to the issuance of the criminal charge against Penn. Bergtold contends that he is entitled to summary judgment on this claim based on qualified immunity. The Court disagrees.

## A

The Court begins with the first prong of the qualified-immunity analysis – namely, whether Penn has presented sufficient evidence of a constitutional violation. He has.

Penn has presented evidence that Bergtold violated his Fourth Amendment rights by maliciously prosecuting him. In order to prevail on a claim for malicious

---

the plaintiff. *Id.* at 651. That did not happen here. Penn also relies upon *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998). In *Baptiste*, the court determined that officers were not entitled to qualified immunity where they, among other things, "viewed a videotape" that contradicted the witnesses' version of events and ignored receipts produced by the plaintiff that provided evidence that the plaintiff did not steal any merchandise. *See id.* at 1257. Here, Bergtold was not confronted with such unimpeachable evidence of Penn's innocence. Finally, Penn cites *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000). In *Gardenhire*, the Sixth Circuit held that an arresting officer was not entitled to qualified immunity. But, unlike here, the defendant officer in *Gardenhire* based his arrest on the "bare allegation" by one witness that the plaintiff had stolen certain items from her. *Id.* at 318. In contrast to this case, in *Gardenhire*, it was not even clear that a crime had occurred.

prosecution in violation of the Fourth Amendment, Penn must "establish that (1) a criminal prosecution was initiated against [him] and [Bergtold] made, influenced, or participated in the prosecutorial decision; (2) there was no probable cause to support the charges; (3) as a result of the legal proceedings, [Penn] suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceedings ended in [Penn's] favor." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (internal quotation marks omitted). In Bergtold's summary judgment motion, he challenges only the probable-cause element of Penn's malicious-prosecution claim.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Green*, 681 F.3d at 865 (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)). *See also Webb v. United States*, 789 F.3d 647, 665 (6th Cir. 2015) ("In section 1983 cases, the existence of probable cause usually poses a jury question").[8] On this

---

[8] In a conflicting line of cases, the Sixth Circuit has held that "probable cause determinations are legal determinations" to be made by a court, not a fact-finder, and that the jury's sole job is to resolve factual disputes underlying the court's probable cause determination. *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005). The Sixth Circuit has recognized that "inconsistently, we have at times asked the jury and at times reserved for the court the issue of whether a set of facts provided officers with probable cause." *McKenna v. Edgell*, 617 F.3d 432, 441-42 (6th Cir. 2010). *See also Harmon v. Hamilton County*, 675 F. App'x 532, 543 (6th Cir. 2017) ("It is true that this court has taken seemingly inconsistent views as to whether the existence of probable cause is a question of fact or law"). For the purposes of this motion, the Court follows the rule as set forth in *Green* above. The Sixth Circuit applied that rule both long before and after *Hale*. *See*, *e.g.*, *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) ("In general, the existence of probable cause in a § 1983 action

record, taking the evidence in the light most favorable to Penn, a jury could reasonably conclude that there was not probable cause to support the criminal charge against Penn. As explained in detail above, there is strong evidence supporting probable cause and strong evidence that probable cause was lacking. Under these circumstances, there is not "only one reasonable determination possible" as to whether the charge against Penn was supported by probable cause. *Id.* Accordingly, the question of probable cause is for the jury.[9]

---

presents a jury question, unless there is only one reasonable determination possible"); *Webb*, 789 F.3d at 665 (stating rule in 2015 decision). In any event, even if the Court applied the rule from *Hale*, the Court would still deny summary judgment on Penn's malicious prosecution claim because there are important factual disputes underlying the probable cause determination that must be made in order to resolve that claim. Among the disputes to be resolved: Did Anthony "sign on" to the identification of Penn by other witnesses, as he seemed to admit during Penn's criminal trial (*see* Anthony Crim. Trial Tr., ECF #36-12 at Pg. ID 1266) or did Anthony never identify Penn as he testified in his deposition here (*see* Anthony Dep., ECF #40-8 at Pg. ID 1565)? And did Simons identify Penn as the thief, as Bergtold claims (*see* Police Rpt., ECF #36-3 at Pg. ID 750), or did she instead tell Bergtold that she did not believe Penn was the thief, as she testified during her deposition (*see* Simons Dep., ECF #40-9 at Pg. ID 1628)?

[9] There is no inconsistency between the Court's holding here that the jury must decide whether there was probable cause for the charge against Penn and the Court's earlier holding that Bergtold is entitled to qualified immunity from Penn's unlawful arrest claim. As explained above, when analyzing whether Bergtold was entitled to qualified immunity from Penn's unlawful arrest claim, the Court had to ask whether Bergtold reasonably – even if erroneously – could have believed that he had probable cause to arrest. It is not inconsistent to conclude, as the Court has, both that Bergtold could *reasonably have believed* that he had probable cause to arrest Penn and that a jury could determine that there was *actually* a lack of probable cause for the charge against Penn.

**B**

The Court next turns to whether Penn has presented sufficient evidence that Bergtold violated a clearly-established constitutional right. The Court concludes that Penn has.

It was clearly established at the time of Penn's arrest that a police officer could not intentionally falsify evidence in order to manufacture probable cause for a criminal charge. Indeed, nearly fifteen years before Penn's arrest, the Sixth Circuit emphasized that "[f]alsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional." *Hinchman v. Moore*, 312 F.3d 196, 206 (6th Cir. 2002). And a year before Penn's arrest, that court explained that a police officer violates the Fourth Amendment when "when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). After Penn's arrest, the Sixth Circuit clarified that its pre-arrest decisions stand for the proposition that a "police officer violates a suspect's clearly established right to freedom from malicious prosecution under the Fourth Amendment '[] when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause.'" *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) (quoting *Newman, supra*)).

Penn has presented sufficient evidence from which a jury could infer that Bergtold intentionally or recklessly made false statements in his police report. An

inference of deliberate or reckless disregard for the truth is permi[ssible]" where a statement is meaningfully "off the mark" from the truth; a minor "discrepancy" is not enough. *Newman*, 773 F.3d at 772. Here, Penn has identified at least three aspects of Bergtold's police report that – viewed in the light most favorable to Penn – were well "off the mark":

- **Bergtold's description of Anthony's identification.** In the police report, Bergtold wrote that Anthony "stated" that he was "*positive* that [Penn] was the [alleged thief]." (Police Rpt., ECF #36-3 at Pg. ID 752; emphasis added.) But Anthony did not positively identify Penn. (*See* Anthony Dep., ECF #40-8 at Pg. ID 1565.) Instead, Anthony said that Penn was not the thief. (*See* Anthony Dep., ECF #40-8 at Pg. ID 1565.) Bergtold thus presented the opposite of what Anthony said and did.

- **Bergtold's description of Simons' identification**. Bergtold wrote in the police report that Simons "positively identified [Penn] as the suspect that [she] saw steal the merchandise from the store" and, alternatively, that she was "pretty sure" that Penn was the thief. (Police Rpt., ECF #36-3 at Pg. ID 750-51.) However, Simons never positively identified Penn to Bergtold and never said that she was "pretty sure" that Penn was the thief. (Simons Dep., ECF #40-9 at Pg. ID 1627.) Instead, she told Bergtold that "she [didn't] believe that [Penn was] the [thief]" and that "[t]he guy [she] saw … [was] larger, taller, different." (*Id.* at Pg. ID 1639.) Thus, Bergtold presented Simons as supporting the

identification of Penn when, in fact, she had indicated that she did not believe that Penn was the thief.[10]

- **Bergtold's description of his interaction with Penn**. Finally, Bergtold created the false impression in his police report that Penn and the thief shared the same *modus operandi* in one significant respect. Bergtold truthfully reported that when the Bed Bath & Beyond employees confronted the thief, the thief immediately said that he was a police officer. (*See* Police Rpt., ECF #36-3 at Pg. ID 749.) Bergtold then implied that Penn followed the same strategy when Bergtold confronted him. More specifically, Bergtold made it appear that Penn was the one who raised the issue of his law enforcement employment and that Penn did so as soon as he began speaking with Bergtold. Bergtold wrote that when he first told Penn that he "needed to speak with him," Penn "got out of [his car], "began walking towards [Bergtold]," stated "I am one of you," and showed Bergtold "a badge." (*Id.*) Bergtold later highlighted that "one of the first things [Penn] told him" was "[I am] one of you." (*Id.* at Pg. ID 750.) In fact, as depicted on Bergtold's dash-cam video, Penn was not the one who raised the issue of his employment as a law enforcement officer, and Penn did not immediately identify himself as a law enforcement officer. Instead, *Bergtold* raised the issue by asking Penn where he worked. And Penn

---

[10] Bergtold did also note in his report that Simons "could not say 100% that [Penn] was [the] suspect." (Police Rpt., ECF #36-3 at Pg. ID 751.) But this statement does not cure the misleading nature of Bergtold's statements quoted above. This statement, too, frames Simons' actual position in a misleading way. The statement suggests that Simons affirmatively believed that Penn *was* the thief but that she was not positive that he was the thief. In fact, as noted above, she believed that Penn was *not* the thief but could not be 100% certain about that fact.

stated that he was "one of you" only after *Bergtold* asked Penn where he worked and whether Penn was armed. (*See* Dashcam Recording, ECF #36-7.) Moreover, Penn did not make the "one of you" statement immediately upon encountering Bergtold. Rather, he made it after the two had been speaking for approximately sixty seconds. (*See id.*) For all of these reasons, Bergtold's description of his encounter with Penn was meaningfully "off the mark."

In sum, Penn has presented sufficient evidence that (1) Bergtold deliberately, or with a reckless disregard for the truth, included in his police report at least three materially false descriptions of the circumstances surrounding Penn's conduct and arrest and (2) these statements contributed to the issuance of criminal charges against him. Thus, Penn has satisfied his burden of showing that Bergtold violated his clearly-established constitutional right. Accordingly, Bergtold is not entitled to qualified immunity on Penn's malicious prosecution claim.

## VI

For all of the reasons stated above, the Court **GRANTS** summary judgment in favor of Bergtold on Penn's unlawful arrest claim and **DENIES** summary judgment to Bergtold on Penn's malicious prosecution clam.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: April 15, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 15, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764